ESTATE OF IGLESIAS v. BOLÍVAR.

APPEAL from the District Court of San Juan.

No. 45.—Decided December 12, 1906.

APPEAL—BILL OF EXCEPTIONS—METHOD OF PREPARING SAME.—In order that a bill of exceptions may be prepared in proper form it should be made a distinct document and as such appear in the transcript, properly headed with the style and number of the action and the nature of the demand, with the recital that it is a bill of exceptions.

ID.—HOW SAME SHOULD BE DRAWN.—A bill of exceptions should begin something like this: "Be it remembered: That on such and such a date, in the above

styled case, the following proceedings took place and the following evidence was introduced on the trial;'' or, ''the following facts were proved on the trial,'' setting out the proceedings or the facts or the evidence in narrative form.

ID.—NOTES TAKEN BY STENOGRAPHER—PURPOSE THEREOF.—The stenographer's notes should not be sent up to the Supreme Court, but counsel should use them in preparing the bill of exceptions, and that is the purpose for which they are made.

ID.—OBJECTIONS MADE DURING THE COURSE OF THE TRIAL—QUESTIONS OF LAW RAISED—RULINGS .OF THE COURT.—The questions of law raised upon the trial must be faithfully set out in the bill of exceptions, as also, the rulings of the court thereupon, and it should also state what objections were made by the party preparing the bill of exceptions and what were the rulings of the court made thereon; these matters should be so clearly stated as to present to the appellate court exactly the questions of law or of fact involved.

ID.—CASES IN WHICH PARTIES DO NOT AGREE UPON A BILL OF EXCEPTIONS— AMENDMENTS THERETO.—In case the parties agree upon the bill of exceptions it should be presented to the judge for his approval; but if no agreement can be reached the original bill, with the amendments proposed thereto, should be presented to the judge for his decision as to what amendments should be adopted, and the bill should be redrawn with the amendments incorporated therein so as to make a perfect bill which can be approved by the court. The. judge may make such further amendments and changes as may be necessary to conform to the truth of what occurred at the trial; when thus amended and engrossed the bill of exceptions should be approved by the judge and filed by the secretary and made a part of the record.

ID.—APPROVAL AND CERTIFICATE OF JUDGE.—The approval of a bill of exceptions by the judge should be made in the form of a certificate to the effect that the bill is correct and true, and he should make an order that the same be filed by the secretary and become a part of the record.

CONTRACTS—COMPLIANCE WITH OBLIGATIONS.—Every contract imposes reciprocal obligations upon the contracting parties, and the party demanding compliance with the contract must prove that he has complied with the obligations thereby imposed upon him.

ID.—FRIENDLY ARBITRATORS.—Where both parties to a contract agree to submit their differences to the decision of friendly arbitrators, but both nevertheless have the power to prevent such differences from being decided by any one but a court of justice, the fact that upon a difference arising between them one of the parties named his arbitrators in the manner provided for and the other refused to accept them does not prevent him from proceeding judicially to enforce his rights.

ID.—EVIDENCE OF OBLIGATIONS.—Where one party to a contract shows that he has complied with the obligations imposed upon him thereby, the burden is on the other party to prove the existence of those circumstances which might tend to relieve him of the duty to comply with the obligations contracted by him under the legal principle *ei incumbit probatio qui dicit non qui negat.*

ID.—INTERPRETATION OF CONTRACTS.—In the interpretation of contracts, and for the purpose of determining the intention of the contracting parties, the acts of the parties at the time the contract was executed and subsequently thereto should be taken into consideration.

APPEAL—EVIDENCE—DOCUMENTS· ACCOMPANYING COMPLAINT.—In order that the documents accompanying the complaint may be considered on appeal as a part of the record, they must be perfectly identified in the transcript.

ID.—CONTRADICTORY EVIDENCE.—Where the testimony of witnesses is contradictory and nothing appears in the record to show that any of the witnesses were unworthy of belief, the findings of the trial court upon such evidence will not be disturbed on appeal.

The facts are stated in the opinion.

Mr. *López Landrón* for appellant.

Mr. *Texidor* for respondent.

MR. JUSTICE WOLF delivered the opinion of the court.

The succession of Edualdo J. Iglesias brought a suit against Gorgonio Bolívar in the District Court of San Juan. The bill of exceptions filed by the appellant sets forth the following facts:

"Now comes the defendant Gorgonio de Bolívar, through his counsel, Jacinto Texidor, and for the purposes of this appeal from the judgment of the District Court of San Juan, rendered in this cause, files this his bill of exceptions, upon which his appeal rests, setting forth therein the facts and the errors into which the district court has fallen, and of which errors mention will be made in said appeal.

"This case was called for trial before this District Court of San Juan the 6th of November, 1905, and the said hearing having been continued on the 10th of November, 1905, at which hearing the plaintiff succession appeared through his counsel, Rafael López Landrón and· Ricardo Lacosta, and the defendant, through his counsel, Díaz and Texidor, and in their name, Jacinto Texidor, and the evidence which will hereinafter be mentioned being presented and heard, on the 30th of March, 1906, the judgment from which this appeal is taken was rendered.

"The case is one for the recovery of rentals.

"The plaintiffs, the succession of Edualdo J. Iglesias, have maintained that by virtue of written contracts with Don Gorgonio de Bolívar y Alvarez, and on account of noncompliance by the latter with the clauses of the said contracts, the sum of $4,905.64 was owing to them as the rental on a match factory situated in the ward of "La Marina," from the 27th of November, 1899, inclusive, to the 31st of December, 1901. And to this action was joined another, which was brought by the same plaintiffs in the year 1900, for the recovery of

6,125 *pesos*, special money, for rents due, and 4,000 *pesos* more, as indemnity, which by the provisions of one of the clauses of the said contracts should be forfeited in case of the noncompliance with the same.

"The defendant opposed this complaint, denying six of the statements of fact set forth therein, and setting up that the plaintiffs had no right whatever to make a claim under said clauses of the contract, which provided that in case of a reduction in the price of matches, or in the event of the installation of another match factory, so that it should become necessary to sell the same at a lower price than 98 cents per gross, the annual rate of rental should be reduced 391 *pesos*, and 30 cents for each 2 cents reduction in the price of matches, counting from 98 cents; and that those sums or prices having been reduced, the time came when, in accordance with that clause of the contract, the defendant was not required to pay any sum whatever; the said defendant also maintaining that the plaintiffs had not complied with the provisions of the contract requiring them to hold at the disposition of the defendant, in the proper place in San Juan, the match factory which they rented; and that by virtue of a later contract it was agreed that if the price of matches should go down, or if a new factory should be established, the succession of Iglesias and Don Gorgonio de Bolívar were each empowered to rescind the contract, and it being sufficient in order that the rescission of the contract should be understood to have been made, that the party desiring to rescind the said contract should notify the other contracting party; and that a new factory having been established in 1897, and the price of matches having been reduced, Bolívar, the defendant, had notified the plaintiffs of his desire to rescind the contract, which contract has in fact and in law stood rescinded since the 27th of November, 1897.

"On the trial the following evidence was introduced: By the plaintiffs, and as documents, a contract of lease executed in San Juan, Porto Rico on the 27th of February, 1891, before the Notary Public Don Mauricio Guerra Mondagón, by Gorgonio de Bolívar & Company, and in representation thereon Gorgonio Bolívar, and the firm 'Iglesias & Company,' and in the name thereof, Don Edualdo J. Iglesias. In the said contract it is set forth that Gorgonio de Bolívar & Company, as well as Iglesias & Company, have in San Juan, Porto Rico, match factories, and that Iglesias & Company have decided to suspend operations in their factory for some time, and the other contracting party has decided to create a new factory, for which reason he has proposed to Iglesias & Company the lease of the one owned by the latter in the ward of the Marina; and they contract

and agree that Gorgonio Bolívar & Company shall receive various stocks of matches from the said 'Iglesias & Company,' and lease the factory, the lessee, Gorgonio Bolívar & Company, paying to Iglesias & Company, the following amounts:

"Two thousand, two hundred and fifty *pesos* after six months from the date of the contract; $2,250 after a year from the date of the contract; and 1,125 *pesos* every three months, counting from the termination of the first year, until the 31st of December, 1896. It is stipulated that in case the factory of Gorgonio Bolívar & Company should be destroyed or disabled or in any other event in which the manufacture of matches should be rendered impossible on account of causes not controlled by Gorgonio Bolívar & Company, or on account of the cost of production exceeding the sums realized from the sale of matches, the contract could be renewed within the stipulated period if the manufacture of matches should be resumed, by reason of the removal of the causes of the suspension of operations. It was also stipulated by the third clause of the contract that when doubts or claims should arise as to the compliance with the provisions of the same, such matter should be referred to friendly arbitrators, consisting of three persons selected by both parties by mutual agreement, and that a fine should be stipulated in the agreement amounting to 4,000 *pesos* to be paid by the party placing obstacles in the way of the arbitrators, or refusing to abide by the decision reached by them; and in the fifteenth clause it is stipulated an indemnity of 4,000 *pesos* shall be paid by the contracting party who should fail to comply with any of the clauses of the contract.

"The plaintiff also presented an instrument providing for an extension and modification of the lease, entered into on the 16th of May, 1904, before the said notary, Mr. Guerra Mondragón, in San Juan, by Mrs. Carmen Iglesias y Ortiz, Mr. Arturo, Mr. Enrique, Mrs. Teresa and Mrs. Carmen Iglesias é Iglesias and Mr. Arturo Carreras y Delgado, and Don Gorgonio de Bolívar y Alvarez, the first, Mrs. Carmen, representing her minor children, Julia, Enriqueta and Edualdo, and her grandchildren, Juana, Juan Gualberto and Emilio, and all of them the Succession of Don Edualdo Iglesias. By the said instrument the former contract of lease is modified, and in clause 4 it is set forth by the said former contract that: 'If during the period of duration of the said contract it should occur that the things contemplated in the said clause should come to pass, it shall be optional with the Succession of Iglesias and Don Gorgonio de Bolívar to ask for the rescission of the contract, and the said rescission will be understood to be effected from the moment such desire is made known to

Gorgonio de Bolívar and *vice versa,* or if the things should happen which are contemplated by that clause, it being understood that the provisions thereof will be subject to compliance during such time as both parties may see fit.'

''The tenth clause of the said contract is also modified to the effect that Iglesias & Company, or the representatives thereof, will not be obliged to have their factory set up, but sell the same or rent to any other person than the contracting party Bolívar. In the sixth clause a modification is made in the rental, fixing the same at 3,500 *pesos* per annum, payable quarterly.

''The plaintiff also introduced in evidence another instrument, executed before the Notary Public, Don Antonio Alvarez Nava, in San Juan, on the 14th of September, 1898, by Doña Carmen, Doña Isabel, Doña Enriqueta Iglesias and Don Edualdo Iglesias, in which it is set forth that on that date Don Gorgonio Bolívar owed them for three quarters on the lease of the match factory, and they ask that Don Juan Arruza, attorney in fact of Bolívar, be required to pay that amount, and in the case that he should offer any excuse for not doing so, the parties appearing believe it necessary to submit the matter to the decision of friendly arbitrators and designate on their part Don Emilio García Cuervo, and as a third, Don Jorge Finlay.

''The plaintiff also introduced in evidence another notarial instrument dated November 24, 1898, executed before the Notary Don Mauricio Guerra Mondragón, the same parties appearing therein as in the instrument last above mentioned, asking that it be made to appear that on requirement being made of Don Juan Arruza to pay, he stated that he had not been instructed by his principal, and that he afterwards stated to Don Benito Zalduondo, husband of one of the parties appearing on the execution of the said instrument, through a letter, that the friendly arbitrators proposed by him were Don Juan Hernández López, Don José H. Boneta and Don Carlos Conde, for which reason the parties require the notary to make known to Mr. Arruza that they do not accept the names of Don José H. Boneta, and Don Carlos Conde, because they lack the necessary legal knowledge to decide the case, but that they do accept the name of Don Juan Hernández López. The said requirement appears to have been made of Don Juan Arruza.

''The plaintiff, Sucesión de Edualdo Iglesias, presented another notarial instrument, executed on the 30th of November, 1898, before the Notary Don Mauricio Guerra Mondragón, the same Iglesias already mentioned appearing, and setting forth that they had received a letter from Mr. Arruza stating that the fact that Don José H.

Boneta and Don Carlos Conde are not lawyers is not a legal ground for challenging their appointment as friendly arbitrators, and that he insists upon their nomination. For which reason the parties to the instrument make a protest to be served upon Mr. Arruza.

"All of the foregoing documents were presented with the complaint as evidence, the same being exhibited by the Notary Thomas Dimoott, constituting the exhibit or document number one in this case, and all of them are and were accepted in evidence on the trial by the defendant; a letter of the 28th of August, 1899, was also presented, which appeared in the first complaint filed by the Succession of Edualdo Iglesias, and which was acknowledged by Don Pedro García under oath; this evidence being that of the plaintiff.

"There appeared as witnesses for the plaintiff several persons.

"Benito Zalduondo, a resident of San Juan, who intervened in the contracts of lease of the match factory, between the Succession of Edualdo Iglesias and Gorgonio de Bolívar, testified that he was the husband of one of the ladies belonging to the Succession of Edualdo Iglesias, and that for this reason, the attorney in fact of Bolívar having attempted to discontinue paying the rental agreed upon in the contract of lease, he had interviewed him and it was agreed that the witness should write Bolívar to ascertain why the rent due was not paid, which he did, but received no reply; he believed that this was about the year 1898; that Bolívar had been since the execution of the first contract in possession of the factory belonging to Iglesias, and as far as witness knows he made no protest on receiving the same, and that the said Bolívar paid the rent punctually during the first years up to the date indicated on which he stopped making payments; that then it was proposed to nominate as arbitrators the attorney at law García Cuervo, and Mr. Finlay, the latter as third arbitrator, Bolívar being required to that effect, who replied that he would not accept the arbitrators mentioned, and proposed Mr. Boneta, who was his procurator, and Mr. Hernández López, his lawyer, and his intimate friend, Mr. Carlos Conde, who were not accepted by the Iglesias, they stating then to Bolívar that if there was no settlement they would resort to the Courts; that the price regulating the payment of the rent by Bolívar, as agreed upon, for matches, was 98 cents per gross, and that when the contract was made Bolívar sold for a greater price; that he thinks it was 12 *pesos* per box of ten gross, and that after that a smaller box has been sold for a lower price than that mentioned in the contract, which was of a size to contain 60 to 65 matches, whereas the smaller box only contained 40; that the price of the first box was maintained at 98½ cents per gross, as they are informed by Meltz

and Gandía and Grau of Mayagüez; that Bolívar reduced the price, but he also reduced the size of the box and the number of matches; that in all of those questions of rescission Mr. Arruza intervened as the attorney in fact of Bolívar, the witness having had conferences with him of a private nature; and replying to the questions of the defendant, stated that he was perfecly sure that Gorgonio Bolívar as one party, and Edualdo Iglesias as the other, were parties to the first contract of lease; that Bolívar took possession of the factory, receiving also some objects which are at present in his possession; tht does not remember how much the rental should be reduced on account of each 2-cent reduction in the price of matches per gross; he believes that in the year when the first contract was made the price of matches was 12 *pesos;* he does not buy matches for his business, but for private use, and knows about the price because the merchants are always informed of the price of those articles; and that matches at that time were the cause of much discussion; that in the year 1897 he thinks the price of matches was 11 *pesos;* that when he interviewed Arruza as the representative of Bolívar he believes the latter owed three quarters rent; that he was the one who collected two or three times, he representing the Succession of Iglesias only to collect; that the interviews which he had with Arruza were of a private nature, and he does not remember whether he stated to Arruza that he called on him merely as Benito Zalduondo, and not in representation of the succession; that Arruza did not notify him that he was speaking with him as a private individual, nor Mr. Carreras in the year 1897; that in regard to this matter, he does not remember having been in the notarial office of Don Mauricio Guerra Mondragón.

"Arturo Carreras, a witness of the plaintiff, resident of San Juan, testifies in regard to the essential parts of this proceeding, that Mr. Arruza told him privately, and Benito Zalduondo, that he was going to rescind the contracts of lease of the match factory between the Succession of Iglesias and Gorgonio Bolívar; that he and Benito Zalduondo went to the house of Arruza and there entered into conversation, and then it was agreed to suspend the rescission and that a letter be written to Bolívar, as was done by Zalduondo with that object, and the said rescission was not effected; that Arruza did not allege a legitimate reason for the rescission of the contract, but that Bolívar had told him that he was going to rescind the same, and that he believes that it was on account of factory accounts; that there were in the match boxes from 60 to 65 matches, these being the size boxes made by the factory of Iglesias and of Bolívar, and the contract was made on that basis, and that after the attempted rescission Bolívar changed

the size of the boxes to a smaller size; that afterwards, as the rental was not paid, it was proposed that the friendly arbitrators be appointed, the Succession of Iglesias appointing one arbitrator and a third party, with which appointments Arruza was not satisfied, and proposed three individuals; that he does not remember how many years Bolívar paid the rent punctually, but does remember that he paid during the first years, and that Bolívar remained in possession of the factory. To questions put by the defendant he replied that the factory is situated in Puerta de Tierra, and that all of the necessary apparatus pertaining to the same is there; that Bolívar is not in possession of the factory, but that he had a contract of lease, and the factory was held by Iglesias; that he and Zalduondo had private conversations with Arruza, the attorney in fact of Bolívar, and that he believes this took place during the latter part of the year 1897, and that afterwards the plaintiffs made the propositions for the appointment of friendly arbitrators, and that later the suit was brought. In reply to questions put by the honorable judge he replied that Iglesias had leased the factory, and that Bolívar was not in possession of the factory of Iglesias; that when the latter made the contract discontinued working the factory, and that the said factory has never been in operation since, and that the removal of the factory from the place where it was on the Marina to Puerta de Tierra, was made with the consent of Bolívar.

"Juan Arruza, witness for the plaintiff, a resident of San Juan, general attorney in fact for Gorgonio de Bolívar up to several years ago, having been attorney in fact during the years 1897 and 1898; says that he is acquainted with the contract of lease between Gorgonio Bolívar and Edualdo Iglesias, and states that the said contract referred first to a match factory belonging to Iglesias & Company, and later to the factory of the Succession of Iglesias; that he was instructed to stop paying the quarterly rental to the succession of Iglesias under the said contract; and that he received that order from Bolívar during the first part of the year 1897 to 1898, such action being based on the fact that competition had arisen and the regular price of matches had declined, and had reached a clause whereby in accordance with a graduated scale the limit set by the contract had been reached, and that in accordance with such clause the same rental paid the year before should be paid; that with the said advice he went to Don Mauricio Guerra Mondragón, who spoke with two of the family of Iglesias, but without a consultation of the family having been called; that he spoke to Don Benito Zalduondo, and with Carreras four or six times, conferring, but that there being no settlement the succession

of Iglesias nominated two friendly arbitrators, and the witness, as the general attorney in fact of Bolívar, proposed three, it being impossible to reach an agreement between the parties, the succession of Iglesias making a protest because he did not come to the appointment of friendly arbitrators; that from that time which he does not remember there had been match boxes of two different sizes, Bolívar having sold such boxes, and the smaller ones at a lower price; that the sale of matches was made by the house of Bolívar, Arruza & Company, on 4 per cent commission; that the witness (replying to questions put by the defendant), had stated to Carreras and Zalduondo that according to the gradual scale which reduced the rate of rental for each 2 cents which matches declined in price had been reached and he can assert that in the year 1897 such price declined, and the Succession of Iglesias were sent memorandums of the sales of matches which had been made, stating the amounts, the purchasing houses and the price; that the sending of those lists was due to the said conferences between Zalduondo, Carreras and the witness, because the former did not conceive that matches were selling at that price; for which reason the witness made copies of the necessary portions of the books, and forwarded the said copies to the said Zalduondo and Carreras, who conferred with him as representatives of the family; that on proposing friendly arbitrators the succession designated two, and the witness designated three; that when the first contract of lease was made between Bolívar and Iglesias, the witness does not remember whether there was any other match factory in the Island; but in the year 1899 there was the factory of Vidal & Company, who had the same kind of a contract with Bolívar, and that of Meltz and Gandía and Grau; that in view of the competition the price of matches declined; that the witness, in view of the order of Don Gorgonio de Bolívar went to the Notary Guerra to make a requirement, but the said notary having had a private interview with Carreras and Zalduondo the official requirement was not made.

"The defendant made his documentary evidence the said contracts of lease between the firm of Gorgonio Bolívar & Company, and Iglesias & Company, of the 27th of February, 1891, and of the 16th of May, 1894, between the Succession Iglesias and Don Gorgonio Bolívar, of extension and modification of leases, both executed in San Juan before the Notary Don Mauricio Guerra, and besides two requirements made by Don José H. Boneta.

"As oral evidence the defendant Gorgonio de Bolívar introduced the following witnesses: Don Juan Vidal, manufacturer of matches, engaged in that business in 1898, but had a factory two years prior not

in operation because he had it leased to Don Gorgonio de Bolívar; that the said contract of lease was terminated by rescission, because one of the conditions was the rescission thereof if other factories were opened in the Island, and that three had been established, and that the establishment of those factories for the time being produced no effect upon the price of matches, but when the witness opened his match factory, the price declined, the witness having sold matches at the price of 6 *pesos*, 7½, 8, and 9½, and sometimes as low as 3 *pesos* and 75 *centavos;* that the witness at one time bought 40 or 50 boxes of match sticks which came from the factory of Iglesias.

''Pedro Gandía, a resident of San Juan, says that he was the owner of a match factory in the month of December, 1897, at which time there existed in the country the match factories of Bolívar, Vidal & Iglesias and Grau, which were in operation before the year 1897; that in the year 1897, in the latter part of December, matches were sold at the factory of the witness at 10 and 11 *pesos* per box, but that the factory box of the witness was the German box, larger than those in common use, and for that reason sold at a higher price; that the price of matches declined in 1897, and in 1898 a still greater decline took place on account of the tariff revision. And replying to questions put by the plaintiff he stated that there were two sizes in the match boxes of Bolívar, and that the smaller box was a little narrower than the one common in commerce, and probably contained a less amount of matches.

''The witness Manuel Lomba, a merchant in San Juan, and a warehouse owner since before the year 1897, and in that year and later years, owned a warehouse and states that he bought matches from Bolívar, and he thinks that in 1898 the price was $7.75 net, knowing this because he had seen the bills of the house, and does not remember whether there were different sizes of match boxes used by Bolívar.

''The witness Dionisio Trigo, a merchant in San Juan, states that he had commercial relations with Bolívar, Arruza & Company, and that he has had to do with the match business and remembers, according to the books of the house from the year 1894 and subsequent years, that there were purchases of matches from Bolívar at a price as low as $3.91, and that in the former provincial money he bought for 7 *pesos* and 65 cents, and that he does not remember whether there were different size match boxes sold by Bolívar, but that he thinks they used the ordinary size; and replying to questions put by the judge he stated that the price stated was for boxes containing 10 gross, and that the first price was in provincial money at 7 *pesos* and 65 cents, and the second in American money.

"The witness Manuel Gamblor says that he is a merchant in San Juan and has been since the year 1894, and that in the years 1896, 1897, and 1898 he bought matches from Bolívar & Company, or Gorgonio de Bolívar, and that the price was 7 *pesos* 65 cents for boxes containing 10 gross.

"The witness José Portilla says that he has a foundry business in San Juan; that he was in the Iglesias factory and knows the steam machinery and the boiler of that factory, and that he has seen that machinery and steam boiler out of the factory, engaged in the salvage of a boat 'Conquistador.'

"On the termination of the evidence of the plaintiff, the defendant prayed the court in accordance with paragraph 5 of article 192 of the Code of Civil Procedure, to render judgment declaring the suit as abandoned on the ground that the plaintiff had not introduced sufficient evidence to base a judgment upon the same.

"The court overruled the motion, and the defendant, through his attorney, took an exception and the same was duly noted.

"On the 30th of March, 1906, the court rendered a judgment embracing three different decisions. First, adjudging the defendant to pay to the plaintiff 4,000 *pesos,* provincial money, or its equivalent in gold, as indemnity for having failed to comply with the provisions of one of the clauses of the contract of lease of the 27th of February, 1901. Second, adjudging the defendant to pay to the plaintiff 2,625 *pesos,* provincial money, or its equivalent in gold, in payment of rental for the quarters from the 27th of February to the 27th of May, due on that date, and the 27th of August, 1898. And third, adjudging the defendant to pay to the plaintiff what he owes for rental corresponding to the period of time between the 28th of August, 1898, to the 31st of December, 1901, that amount being fixed in accordance with the fourth clause of the extended contract of lease; and appointing an arbitrator to fix those amounts, and imposing the costs upon the defendant."

After setting forth these facts the bill of exceptions continues to set out a number of errors, and attached to the said bill of exceptions there is a so-called amendment to the same, the facts set out therein being as follows:

"Now come the plaintiffs, members of the Succession of Iglesias, and propose the following amendments to the bill of exceptions of the defendant, Gorgonio Bolívar.

"1. That by public instrument of lease executed in this city the 27th day of February, 1901, before the Notary Don Mauricio Guerra, introduced and admitted as evidence—the merchant of this city, Don Gorgonio de Bolívar y Alvarez, as managing partner of the firm established in this city under the firm name of 'G. Bolívar & Co.,' leased from the firm known as Iglesias & Co., also of this city, represented by its managing partner, administrator with the use of the signature, Don Edualdo J. Iglesias y Font, of the same city, the match factory belonging to the latter firm, situated in the ward of La Marina.

"2. That by the third clause of the said instrument the firm of 'G. Bolívar & Co.,' or the representative of the rights thereof, and as the only indemnity for delay in payment of rent on the factory, as is explained in the foregoing instrument, assumed the obligation to pay to Messrs. Iglesias & Company, or to their representative, the following amounts:

| | |
|---|---|
| On the 27th of August, 1891 | $2, 250 |
| On the 27th of February, 1892 | 2, 250 |
| Total for the first year | 4, 500 |

and in the subsequent years, up to the termination of the contract, at the rate of 1,125 *pesos* each three months.

"3. That by the sixth clause it was agreed that neither the change of the firm name of G. Bolívar & Company nor the sale of the match factory nor the closing down of the said factory, whatever might be the circumstances or reasons, exception being made of cases of the act of God, or public enemy which are set forth in the instrument, should in any way affect the contract, since it was the intention of the contracting parties that the firms G. Bolívar & Company and Iglesias & Company should be understood permanent institutions in so far as the stipulations of the contract were concerned, during the term or duration of the same.

"4. By the twelfth clause it was agreed that if doubts should arise as to the meaning and compliance of this contract, and if claims of any kind were made, the same should be submitted to the decision of friendly arbitrators appointed by each party—the number being three—by mutual agreement, within the term of three days; that within a further term of the same length the proper instrument should be drawn up before a notary, fixing the conditions of the arbitration, the points and installments to be decided, etc., in accordance with the Law of Civil Procedure; that the first term should be counted from

date on which by letter or notarial instrument the necessity of such arbitration should be made to appear, and the second from the date on which the parties should agree as to the conditions of the instru-, ment, and in any case within ten days counting from the moment the requirement should be made for the nomination of arbitrators.

"5. That by the thirteenth clause it was stipulated that in case the parties should not come to an agreement in the designation of the friendly arbitrators, or the drawing of an instrument in the periods fixed, they were to be at liberty to resort to the courts of justice.

"6. That in the fifteenth clause it was finally stipulated that the contracting party who should fail to comply with the conditions and clauses of this contract, should pay to the other party *for this simple fact* an indemnity amounting to *4,000 pesos, always without prejudice to the compliance with the obligations contracted in this agreement.*

"All of the foregoing appears from the first copy of the notarial instrument attached to the complaint, under number 1, on the 4th of October, 1899, for the recovery of the rental due up to and including the quarter ending the 27th of August, 1899.

"That by public instrument executed in this city on the 16th of May, 1894, before the Notary Public Don Mauricio Guerra—introduced and admitted as evidence—the Succession of Edualdo J. Iglesias y Font, composed of his widow, Mrs. Carmen Iglesias y Ortiz and her legitimate children named Arturo, Don Enrique, Da. Teresa, Da. Carmen and Da. Isabel Iglesias é Iglesias, as one party, and Don Gorgonio de Bolívar y Alvarez as the other party, in their own right, and extended and modified the first contract of lease of which mention has been made, under the following terms and conditions.

"8. By the first clause they extend for five years counting from the 31st of December, 1896, to the same day and month of 1901, the contract of lease of the match factory, situated in the ward of La Marina of this city, which the firms of this city, Bolívar & Company, and Iglesias & Company, had entered into, which was extended in due form by the heirs and successors of the rights of Don Edualdo J. Iglesias y Font, and Don Gorgonio de Bolívar Alvarez, the latter as owner of the assets and liabilities of the firm of G. Bolívar & Company.

"9. By the second clause the third clause of the after-mentioned contract of lease of the 27th of February, 1891, executed before the same notary, Mr. Guerra, was changed in regard to payment in the following manner:

" 'The payments shall be made in the money current on the day of

payment each quarter, and if during the term of the said contract or its extension a change in the money should take place, the term current money shall be understood to mean the money in circulation bearing the national seal or authorization of the Government, but the quarter in which the change is made, and the subsequent quarter, shall be paid with such discount as the Government may fix.'

"10. By the sixth clause it was definitely stipulated that Don Gorgonio de Bolívar y Alvarez, his representatives and heirs shall pay to the Succession of Edualdo J. Iglesias y Font, counting from the 28th day of March, 1894, as the price of the lease, 3,500 *pesos* annually, payable quarterly in the manner indicated in the third clause of the contract of lease, the rate therefore being modified at present and as many other conditions contained in the clauses of which mention has been made in this document of extension.

"Which facts appear from the first notarial copy attached under number 2 to the said complaint, relating to the first payments due.

"11. That by notarial instrument of the 14th of September, 1898, executed before the Notary Don Antonio Alvarez Nava, the Succession of Don Edualdo J. Iglesias y Font, required Don Juan Arruza y Urrutia, a merchant of this city, in his capacity of general attorney in fact of Don Gorgonio de Bolívar y Alvarez, to pay the amount of the three quarters due up to that time and not paid, to wit:

| | |
|---|---:|
| 27th of February, 1898, amount in c/m......... | $875 |
| On the 27th of May, 1898, amount in c/m........ | 875 |
| On the 27th of August, 1898, amount in c/m..... | 875 |
| Total.............................. | 2,625 |

and further, in case the said Arruza should protest and give any excuse for failing to make the payment, and it should be deemed necessary to resort to the decision of friendly arbitrators, as provided for in the twelfth clause of the contract of lease, and which remained in force in the extension thereof, the parties making the requirement should propose at that time as friendly arbitrators the lawyer Don Emilio García Cuervo, a resident of this city, and as the third for the same office, Don Jorge Finlay, also of this city.

"Mr. Arruza Urrutia replied to said requirement that although Don Pedro Bolívar and he were attorneys in fact for Don Gorgonio de Bolívar y Alvarez, they had no instructions from their principal in regard to this matter, and that if they should receive instructions they would act in accordance with the same.

"It so appears from the notarial instrument which accompanies the complaint under number 3 of the first leases.

"12. That by notarial instrument executed in this Capital on the 24th of November, 1898, before the Notary Public Don Mauricio Guerra, in the third clause the Succession of Iglesias sets forth that thereafter Mr. Arruza y Urrutia stated to Don Benito Zalduondo that he had received proper instructions from his principal, and before deciding awaited the opinion of the Lawyer Juan Hernández López; and that on 'yesterday he sent to the said Mr. Zalduondo a letter proposing as friendly arbitrators Don Juan Hernández López, Don José H. Boneta and Don Carlos Conde.'

"13. That the Succession of Iglesias not being satisfied with the arbitrators Messrs. Boneta and Conde, procurator and friend respectively of Mr. Arruza, they required the Notary Guerra to state to the attorney in fact of Mr. Bolívar 'that they were satisfied with the designation of Mr. Hernández López,' and proposed for their part the Attorneys Don Emilio García Cuervo, and Don Manuel F. Rossy; so that at the same time Mr. Arruza should state whether or not he would accept the arbitrators proposed by them, in order that they might proceed, in case his answer should be in the affirmative, to notify them of their appointment, and execute after acceptance the proper instrument of obligation, within the term designated by the twelfth clause already mentioned.

"Mr. Arruza being made aware of the requirement of the Succession of Iglesias, stated that at the proper time he would reply in such manner as he might deem proper.

"Such appears from the notarial instrument marked number 4 which served as evidence to the said complaint.

"14. That on the 30th of November of the same year, 1898, the Succession of Iglesias exhibited to the notary, Mr. Guerra, for insertion in the instrument, the original of a letter addressed under the date of the 28th of that month and year by Don Juan Arruza y Urrutia, to the president of the family council of the Succession of Don Edualdo J. Iglesias y Font, in which the said Mr. Arruza insists upon his nomination of friendly arbitrators composed of Don Juan Hernández López, Don José H. Boneta and Don Carlos Conde.

" 'In view of the insistence of Mr. Arruza in regard to the three names designated by him, which is not customary, and if the party appearing should accept the three persons mentioned, one the lawyer of Mr. Arruza, the other his procurator, and the third his friend, they would remain in the air and without defense;' the Succession of Igle-

sias draws an instrument before the said notary, protesting against the partial procedure of the representative of Mr. Bolívar, and being determined to comply with the provisions of clause 12 and 13 of the instrument of obligation, after notification to Mr. Arruza y Urrutia by the unanimous consent of the succession.

"So they executed by notarial instrument under number 5 attached to the said complaint.

"15. From the foregoing it is inferred:

"a. That the parties not having reached an agreement in regard to the nomination of friendly arbitrators, they were at liberty to resort to the courts of justice.

b. That Don Gorgonio de Bolívar y Alvarez owed. on the 4th of October, 1898, to the Succession .of Don Edualdo J. Iglesias y Font, the folowing amounts:

"For rents due on the quarter ending the 7th of—

| | |
|---|---:|
| February, 1898 | $875 |
| May, 1898 | 875 |
| August, 1898 | 875 |
| November, 1898 | 875 |
| February, 1899 | 875 |
| May, 1899 | 875 |
| August, 1899 | 875 |
| Total rents due | 6,125 |
| Amount of indemnity in case of failure to comply with the contract by not paying the rent agreed in clause 15 of the contract of lease, and ratified by clause 6 of the extension | 4, 000 |
| Total amount of claim | 10, 125 |

"16. That the Succession of Iglesias, basing its action on the facts hereinbefore related, brought suit against Don Gorgonio de Bolívar y Alvarez under date of 4th of October, 1899, and in accordance with the former Law of Civil Procedure, for the sum of $10,125, current provincial money at the time, as principal, and further $600 in the same money, which, they then calculated for costs, but as the district court of that time presided over by the worthy Juan Ramón Ramos refused to issue execution, because in its opinion the public instruments of lease did not constitute an obligation to pay in money or

specie, which was liquidated and due; the Honorable Supreme Court intervened on appeal, annulling said refusal, and issuing the execution in the terms requested.

"This executive suit remained pending a hearing from 1901.

"That after the last installment claimed in that executive suit, or in other words the quarter ending on the 27th of August, 1899, the following quarters have come due without payment being made, up to the 31st of December, 1901, according to the first clause of the instrument of extension mentioned, of the 16th of May, 1894:

"*For rents due in the quarter ending the 27th of*—

| | | |
|---|---|---|
| a. | November, 1899, in provincial money... | $875.00 |
| b. | February, 1900 | 875.00 |
| c. | May, 1900 | 875.00 |
| d. | August, 1900 | 875.00 |
| e. | November, 1900 | 875.00 |
| f. | February, 1901 | 875.00 |
| g. | May, 1901 | 875.00 |
| h. | August, 1901 | 875.00 |
| i. | November, 1901 | 875.00 |
| j. | For rent corresponding to the 27th November, 1901, to the 27th of December, 1901 | 291.66⅔ |
| k. | Rent corresponding to four days from the 27th of December, 1901, the date of the last period of the contract, according to the first clause of the instrument of extension referred to, of the 16th of May, 1894 | 9.4086 |

Total in provincial money........... 8,176.0752

"Which total of $8,176.0752 in provincial money, equivalent to $4,905.6454, Don Gorgonio de Bolívar y Alvarez owes to the Succession of Edualdo J. Iglesias y Font as the last installments due or rentals due since the 27th of November, 1899, as is seen, up to the 31st of December, 1901.

"18. That basing their action on the foregoing facts the Succession of Iglesias brought suit against Don Gorgonio Bolívar y Alvarez, praying for a final judgment condemning him to pay the said total amount of $4,905.6454 as rent on the match factory in the ward of La Marina, from the 27th of November, 1899, inclusive, up to the 31st

of December, 1901, with further, the payment of all costs and attorneys fees of the plaintiff.''

The appellee, in the said amendment hereinbefore referred to, discusses the errors alleged by the appellant in the statement made of the same.

This court has discussed, in the case of *Eurípides López* v. *The American Railroad Company of Porto Rico*, the proper manner of preparing a bill of exceptions, where the court, through the opinion of Mr. Justice MacLeary, says as follows:

''This supposed bill of exceptions is not prepared in proper form. It does not state that it is a bill of exceptions, nor does it state that evidence was taken on the trial of the case, nor what that evidence was, but merely embodies questions and answers which may have been copied perhaps from the stenographer's notes. Then follow amendments to the so-called minutes of the bill of exceptions, with the certificate of the district judge that it was approved, sealed and signed by him with the amendments presented to the same, and ordering that it be returned and delivered to the secretary of the court, and attached to the judgment roll. Another certificate by the same officer states that the bill of exceptions with the amendments presented have been accepted by him, signed and sealed, and that they are believed to be correct and true. These certificates are dated the 15th of February, 1906. Why two certificates of the judge were deemed necessary does not appear. There should be but one.

''In order to prepare a bill of exceptions in proper form, it should be made a distinct document, and as such appear in the transcript, properly headed, with the style and number of the action, and the nature of the demand, with the recital that it is a bill of exceptions. It should begin something like this: 'Be it remembered that on such and such a date, in the above styled case, the following proceedings took place and the following evidence was introduced on the trial;' or, the following facts were proven on the trial, setting out the proceedings or the facts or the evidence in narrative form. Of course, the stenographer's notes should be used by the attorney, in preparing the bill of exceptions; that is the purpose for which they were made. Such notes or copies thereof, are not, under any circumstances, to be sent to this court. If any questions of law have been raised upon the trial they can be set out as they occurred in the bill of exceptions,

with the ruling of the court thereupon, and it should also be stated what objections were made by the party preparing the bill of exceptions, and what were the rulings of the court made thereon.

''These matters should be so clearly stated .as to present to this court exactly the questions of law or of fact involved. And finally, if the bill of exception should be amended by the opposing counsel and the amendments accepted by the counsel preparing the bill, they should be incorporated into it in proper form, and not merely attached thereto as amendments. When the counsel agree upon the bill of exceptions, if they can agree, it should be presented to the judge for his approval, and if no agreement can be made the original bill of exceptions with the amendments proposed thereto should be presented to the judge for his decision as to what amendments should be followed; and finally, when the amendments are settled, the bill should be redrawn, with the amendments incorporated into it, so as to make a perfect bill which can be approved by the court. If necessary the judge may make further amendments and changes to conform to the truth of what occurred at the trial. When thus amended and engrossed the bill of exceptions should be approved by the judge .and filed by the secretary and made a part of the record. The judge should certify that the document is correct and true and make an order that the same be filed by the secretary and become a part of the record. All this should appear over the official signature in a written certificate of the judge trying the case.''

It is true that in the case of *Marcelino Solá Rodríguez* v. *Pedro Orcasitas Muñoz* the court suggested that an assignment of errors be filed, and the bill of exceptions with the assignment of errors was subsequently approved in conformity with section 218 of the Code of Civil Procedure. We thought it advisable in that case to ask for an assignment of errors, but a better practice, and one which should be followed by attorneys, is the method set out in the case of *López* v. *Railroad Company*, cited above.

All the essential facts of the case being set out in the bill of exceptions and the amendment thereto, we come now to consider the errors which counsel for the appellant sets forth and which he discusses more extensively in his brief. It is true, as alleged by counsel, that every contract imposes reciprocal

obligations, and we agree with him that the Succession of Edualdo Iglesias should have proved at the trial that they had complied with each and every obligation imposed upon them. We think such proof was made by appellee. When the witnesses of the respondent showed that the appellant paid the first installment due, acting under the contract, and also showed the attempted rescission of the same, it was sufficiently proved that the factory was held subject to the disposition of the appellant, Bolívar.

With respect to the appointment of friendly arbitrators the contract is so worded as to leave it in the power of either party to prevent action by any one but a court, and even assuming that the arbitrators nominated by the appellant were made in due course of law, the failure of the respondent to accept them does not, as we see the contract, prevent said respondent from beginning a proceeding in court.

It was not incumbent upon the plaintiff below, after he had shown his performance of the terms of the contract imposing duties on him, to prove the negative fact that no other match factories had been established in the country or that the price of matches had not gone down to such an extent as to relieve Bolívar from paying anything for rent. This was a matter which was to relieve the defendant from the necessity of performing his part of the contract, and the burden of proof was on him to show the competition and the reduction in the price of matches. *Ei incumbit probatio qui dicit non qui negat.* (Dig. Lib., 22 Tit., 12.)

In the bill of exceptions it appears that the witness Zalduondo testified that Bolívar was in possession of the factory of Iglesias from the time of the first contract without having made any kind of protest. Zalduondo was the witness of the complainant below. He further testified that Bolívar took possession of the factory, receiving as well some objects which he still has in his possession.

The witness Carreras testified that the factory was now in Puerta de Tierra; that all the implements and utensils were

there, and that Bolívar was not in possession, but that he did let it under a contract of rental; and that the factory was within the power of Iglesias.

Now, while these witnesses were somewhat contradictory, if a strict interpretation of the words of the contract is urged the testimony of the witness Zalduondo would be sufficient for the court below to have deduced that the factory was actually in the possession of Bolívar. The question depends largely upon the interpretation which is to be given to the contract. It may be questioned whether the two instruments are properly set out in the record. The bill of exceptions refers to the writings by numbers and as accompanying the complaint, but the documents inserted in the record bear no numbers at all. This court has made reference to the faultiness of such practice in the case of *Díaz Caneja* v. *Pedro María Rossy,* decided by this court on the 4th day of June, 1906, and subsequently approved by the case of *Eurípides López* v. *American Railroad Company of Porto Rico,* heretofore cited. With this scanty identification of the instruments, we cannot consider them as being part of the record. Enough of these writings, however, appears in the bill of exceptions and its amendments to deduce that it was not necessarily intended that Bolívar should be immediately put in physical possession. The instrument of 1894 shows that the respondent was not required to keep his factory mounted (*montada*), but Iglesias & Company were to preserve the apparatus and tools, without the power to sell them or to rent them to any person than to the contracting party, Bolívar. These words of the contract are an indication that it was not expected that Bolívar should take physical possession of the factory.

Section 1249 of the Civil Code says that in order to judge of the intention of the contracting parties attention must be principally paid to their acts contemporaneous and subsequent to the contract. The acts of Bolívar and his attorney in fact, first in attempting to give some sort of a notice of rescission of the contract and subsequently in attempting to as-

sert the contract was rescinded by its own terms by reason of the competition and the decline in the price of matches, show very clearly what the underlying idea in the execution of the contract was. Iglesias & Company and Bolívar, as shown by the contract, were both engaged in the match business. The idea of Bolívar was to do away with the competition of Iglesias & Company. With that object in view a contract was drawn which would prevent Iglesias & Company from continuing to manufacture matches, and enable Bolívar at any time to use the factory for his own purposes. The writings evidencing the contract fixed a certain time when the obligations on the part of Bolívar to pay should be considered as ended, and the efforts of the appellant, as disclosed by the evidence, were directed not so much to show that Bolívar was not in possession of the factory, but that the obligations which the contract imposed upon him had ceased by virtue of the changed conditions of the match market. The acts of the parties leave no doubt that the essential conditions to be performed by the respondents, namely, the cessation of operations and readiness to deliver, had been performed by the Succession Iglesias.

The slight indication in the record of the machinery having been used for the purpose of saving a vessel has no particular force, because it does not set forth that the machinery was actually rented or delivered, or under what circumstances, and, without any showing that the machinery was in any way injured, this evidence must be disregarded by us.

The principal defense of the appellant, as we take it, was that the competition described in the contract had arisen and that under such competition the appellant was no longer obliged to pay the sums which the contract set forth. On this subject there is considerable conflict of testimony. The witnesses for appellant show that the price of matches had gone down, but they are not clear in their testimony as to what kind of boxes Bolívar was selling—whether it was the same box referred to by the contract. On the other hand, the wit-

nesses for the respondent testified in the court below that Bolívar had voluntarily changed the size of his match boxes. The witnesses testified that at different times different prices were paid for matches. There is no attempt to show that Bolívar was forced to sell matches at a lower rate by reason of the competition, but that he actually did so sell them. The court below may have drawn the inference that the establishment of other match factories might have caused Bolívar to change the size of the boxes that he offered the public. We take the intendment of the contract to be that Bolívar should be relieved of further payment if the boxes of matches to which the contract refers had gone down on the open market. The burden of this proof was on the appellant. We are not satisfied from the testimony that the market price of the boxes did go down, nor that the witnesses of either party were testifying about the same article. It was not shown that the witnesses of the plaintiff and of the defendant were talking about boxes of matches of the same size. However, if there were in other minds any doubt we should not disturb a judgment arrived at by the court below where, as in this case, there was a conflict of testimony, and where there is nothing in the record to show that any of the witnesses were not worthy of belief.

Other questions are raised by the appellant concerning the form of the judgment, and one of them is that the defendant be adjudged to pay the $4,000 mentioned in the penal clause of the contract for having failed to comply with one of the conditions stipulated in the contract, without specifying which clause was not complied with, and undoubtedly the failure to comply which is referred to by the district court is the failure to pay the rent which was due. The judgment grants some of the prayers of the complaint in some respects, and denies the other relief asked for by the complainant. It did not need to set out the reasons for arriving at its conclusions. One of the awards made by the court is left for a subsequent calculation by an expert. This is followed up by an order of the court naming the person to determine the amount of the award.

We think the form of the judgment sufficient for the purposes of this case, and the judgment itself must be affirmed.

*Affirmed.*

Chief Justice Quiñones, and Justice Figueras concurred.

Justices Hernández and MacLeary did not take part in the decision of this case.